[Civ. No. 19504. Second Dist., Div. Three. July 22, 1953.]

PETER A. CARLSON et al., Respondents, v. LUTHER LINDAUER et al., Defendants; GOLD E. LINDAUER et al., Appellants.

Bodkin, Breslin & Luddy for Appellants.

Wellborn, Barrett & Rodi and Frank C. Hubbard for Respondents.

VALLÉE, J.—Appeal by defendants-cross-complainants, referred to as defendants, from a judgment for plaintiffs entered on an order sustaining demurrers to the answer and to the cross-complaint without leave to amend and on an order granting plaintiffs' motion for judgment on the pleadings in suit to quiet title to realty.

The complaint is in the usual form of one to quiet title. Defendants answered and filed a cross-complaint. Plaintiffs demurred to the answer on the grounds it does not state facts sufficient to constitute a defense, and that the defense is barred by the provisions of section 319 of the Code of Civil Procedure; and to the cross-complaint, on the grounds it does not state facts sufficient to constitute a cause of action, and that any cause of action is barred by the provisions of sections 318 and 319 of the Code of Civil Procedure. Plaintiffs also moved for judgment on the pleadings on the grounds the answer does not raise any material issue and the cross-complaint does

not state a cause of action. The demurrers were sustained without leave to amend and the motion was granted. Defendants appeal from the judgment which followed. ▮ They also appeal from the orders sustaining the demurrers and granting the motion for judgment on the pleadings. Since these orders are nonappealable the appeals therefrom will be dismissed.

The answer admits plaintiffs are the owners of the surface rights in the realty; denies plaintiffs have any right, title, or interest in the oil rights; alleges the interest of plaintiffs in the surface rights is subject to rights, privileges, and easements in connection with exploring and drilling for oil in accordance with a conveyance from H. T. Rudisill to Union Oil Company, recorded March 29, 1904; alleges defendants claim an estate and interest adverse to plaintiffs; denies defendants' claims are without right.

The answer further alleges:

A. Luther Lindauer, father of two defendants and grandfather of the other two, died August 11, 1936. At that time he was the owner of the surface rights, but not of the oil rights. By his will he devised and bequeathed all his estate to his wife, Lucy, the mother of two defendants and the grandmother of the other two. About August 28, 1936, Lucy was appointed and qualified as executrix of Luther's will.

B. April 1, 1940, while she was executrix of Luther's will, Lucy, individually, entered into a written agreement with Union Oil Company. The agreement was between Union "and the owners of certain interests in the lands" described, including Lucy. One of the parcels of land described in the agreement was that in suit here. The agreement recited that by a recorded deed, dated April 12, 1904, Union acquired from H. T. Rudisill and wife, all oil, gas, and like substances in, upon, and under the described parcels of land. The agreement provided:

"1. This agreement shall apply only to the lands hereinabove described. Whenever hereinafter the term 'lands' shall be used it shall be taken to mean, unless the context shall otherwise so provide, the lands hereinabove described or a portion thereof. Whenever hereinafter the words 'lands subject to this agreement' shall be used, they shall be taken to mean lands forming a part of the lands hereinabove described which belong to an Owner or Owners who have signed this agreement, and which have not been quitclaimed by Union.

"2. Union is about to commence the drilling of a test well on some part of said lands for the purpose of determining the existence therein of oil, gas and other hydrocarbon substances and whether or not the same can be produced therefrom in quantities deemed paying by it. From time to time additional test wells, as in Union's opinion are required, may be drilled, but in any event unless Union shall develop production on said lands in quantities which it deems paying within a period of five (5) years from the first day of April, 1940, it will thereupon quitclaim to the respective Owners, as their interests may appear, all of its right, title and interest in and to the oil, gas and other hydrocarbon substances in the said lands and the rights in connection therewith granted to Union by the deed hereinabove referred to.

"3. In the event any of said test wells demonstrate that oil, gas or other hydrocarbon substances can be produced from said lands in such paying quantities, Union will, within said five-year period, determine which of said lands it wishes to retain hereunder for the purpose of further exploration and of development for oil, gas and other hydrocarbon substances. Thereupon all of said lands which Union does not so elect to retain under this agreement shall be by it quitclaimed to the respective Owners thereof free and clear of all claims of whatsoever kind by Union, excepting such rights-of-way for pipe lines and pole lines as shall be necessary or desirable for Union's operations on retained lands, and as shall then be in use or shall be selected by Union.

"4. In the event, however, that at any time during said five-year period or afterwards Union shall determine to its own satisfaction that any portion of said lands is not capable of producing oil, gas or other hydrocarbon substances in quantities deemed paying by Union, it shall quitclaim to the Owner or Owners thereof all of its right, title and interest in and to said lands, subject to said rights-of-way, and thereupon such lands shall no longer be subject to this agreement.

"5. All owners of lands subject to this agreement shall be entitled to participate in the payments made on account of the value of production as hereinafter set forth, unless and until such lands shall be quitclaimed.

"All owners of lands hereinabove described shall be entitled to share in payments on account of production obtained from wells located on said lands, only from and after the date of their signing this agreement; provided, however,

that to become entitled to any participation hereunder such owners must sign this agreement within said five-year period.''

Union agreed (subparagraph (a)) to pay to each signatory owner of lands 10 per cent of the value of the oil and gas produced from the lands, and the value of 40 per cent of the gasoline and other substances extracted from such gas after specified deductions, and to pay any damage caused by its operations. The agreement also contained this provision:

''The right to receive payments under subparagraph (a) hereof shall at all times be and remain appurtenant to the lands in respect of which such payments accrue and shall be and remain inseparable from the ownership of such lands. Any attempt to separate such rights and ownerships, respectively, shall be without effect hereunder and shall not be binding upon Union; . . .''

The agreement was recorded July 2, 1940.

C. August 11, 1940, Lucy died and Gold, a son of Luther and Lucy, was appointed administrator with the will annexed of Luther's estate. August 30, 1940, Lucy's will was admitted to probate and executors were appointed.

D. April 11, 1941, the probate court, in the estate of Luther, confirmed the sale of ''the property'' to plaintiffs, in consideration of $5,500. April 12, 1941, the administrator executed and delivered a deed conveying to plaintiffs ''all the right, title, and interest of the decedent Luther Lindauer at the time of his death, and all right, title, and interest that the estate may have subsequently acquired by operation of law or otherwise'' in and to ''the property.'' The estate of Luther did not own, possess, nor have any right to any interest, nor did it thereafter acquire any interest in ''the oil rights of the property.'' The deed did not convey to plaintiffs any interest in the oil rights.

E. Part of the property owned by Lucy at the time of her death was the right to receive a quitclaim deed from Union, conveying to her all of Union's right, title, and interest in and to the oil rights if Union elected, pursuant to the agreement of April 1, 1940, to quitclaim such rights ''during Lucy's lifetime.'' Such right constituted a part of Lucy's estate. The final decree of distribution made September 1, 1941, in Lucy's estate, distributed to defendants Gold E. Lindauer, Genevieve M. Hough, and Gus L. Lindauer, deceased father of defendants Luther Lindauer and Dolores Lindauer Olivarez, and they became the owners of, the oil rights. Upon the death of

Gus L. Lindauer, defendants Luther Lindauer and Dolores Lindauer Olivarez succeeded to his interest.

F. On December 1, 1941, pursuant to the agreement of April 1, 1940, Union elected to quitclaim to Lucy and executed a deed by which it quitclaimed "unto Owner, its heirs, successors and assigns," all of its right, title, and interest in the realty. This deed was recorded December 5, 1941, and contemporaneously therewith an executed duplicate copy was mailed to Lucy at her address appearing in the agreement of April 1, 1940, and was received by defendants.

G. None of the defendants has conveyed any of his interest in the oil rights and defendants are the owners thereof.

The allegations of the cross-complaint are substantially those of the answer, with these additions:

1. On May 27, 1903, W. J. Hole and wife were the owners of the fee title to the realty; and on that date, by deed recorded June 6, 1903, conveyed to H. T. Rudisill the oil rights together with the right to enter on the property for the purpose of extracting, etc., the substances constituting the same.

2. On March 12, 1904, Rudisill by deed recorded March 29, 1904, conveyed the oil rights together with the right of entry for extraction, etc., to Union.

3. June 19, 1919, W. J. Hole and wife, by deed recorded July 25, 1919, conveyed to La Habra Heights Company the surface rights in the realty "excepting and reserving" the oil rights. The oil rights were then owned by Union.

4. July 17, 1935, La Habra Heights Company, by deed recorded July 27, 1935, conveyed such surface rights to Luther Lindauer. This deed "did except and reserve" the oil rights.

5. The transaction by which plaintiffs acquired the deed from the administrator with the will annexed of the estate of Luther was consummated through an escrow with a title company as escrow holder. On April 24, 1941, said escrow holder, in writing, advised plaintiffs that in the property to be conveyed the oil rights constituted "an exception and reservation" and would not be conveyed by said deed. On April 28, 1941, plaintiffs, in writing, approved the "exception and reservation" of the oil rights.

6. Cross-complainants are the owners of the oil rights and plaintiffs have no right, title or interest therein.

Defendants, in support of their contention that the answer states a defense and the cross-complaint a cause of action, argue that the right to receive a quitclaim deed from Union was a personal right of Lucy's; that the effect of delivering

and recording the deed after her death was to vest the equitable title to the oil rights in defendants; that while a deed which names a dead person as grantee does not pass the legal title, equity will enforce the deed in favor of the successors of the dead person; that defendants as devisees of Lucy are her successors; that the deed from Union did not convey title to the oil rights to plaintiffs as successors of Luther in the surface rights, and that neither the defense nor the cause of action pleaded in the cross-complaint is barred by either section 318 or 319 of the Code of Civil Procedure. Plaintiffs argue that the law will not permit Lucy as executrix of Luther's will to acquire a personal interest in real property which would not pass to a purchaser at a probate sale of such property; that Lucy bargained away rights in real property held in Luther's estate under probate administration; if the deed from Union to Lucy is a nullity, title did not pass and defendants have no interest in the property; that all rights of Lucy's estate in the agreement of April 1, 1940, were transferred to plaintiffs by the deed of the administrator of Luther's estate; and that the defense and the cause of action attempted to be stated are barred by sections 318 and 319 of the Code of Civil Procedure.

██ On appeal from a judgment entered on an order sustaining a demurrer to a pleading without leave to amend, the allegations of the pleading must be regarded as true.

██ A motion for judgment on the pleadings performs the office of a general, not a special, demurrer; and where the answer, fairly construed, states a good defense, a motion for judgment on the pleadings should be denied, and, in this case, if the cross-complaint states facts sufficient to constitute a cause of action the motion should have been denied. Other rules applicable to consideration of a general demurrer to a pleading and to consideration of a motion for judgment on the pleadings have been stated many times and need not be repeated. (*McIsaac* v. *Pozzo*, 26 Cal.2d 809, 812-813 [161 P.2d 449] ; *Toney* v. *Security First Nat. Bank*, 108 Cal. App.2d 161, 167 [238 P.2d 645] ; *Hardy* v. *San Fernando Valley C. of C.*, 99 Cal.App.2d 572, 577 [222 P.2d 314] ; *Wirin* v. *Horrall*, 85 Cal.App.2d 497, 500-501 [193 P.2d 470] ; *Smith* v. *Beauchamp*, 71 Cal.App.2d 250, 256 [162 P.2d 662] ; *Gallagher* v. *California Pac. T. & T. Co.*, 13 Cal.App.2d 482, 486 [57 P.2d 195].)

██ In a suit to quiet title, general allegations or denials of ownership are, as a rule, sufficient. But when a party un-

dertakes to plead his title specially, as well as generally, and the special allegations reveal the weakness of his title or that he has no title, their effect is to nullify the general allegations and denials. (*Martin* v. *Hall,* 219 Cal. 334, 337-338 [26 P.2d 288]. See also *Ephraim* v. *Metropolitan Trust Co.,* 28 Cal.2d 824, 833 [172 P.2d 501].) Where an allegation of ownership is expressly predicated on specific averments, the allegation of ownership is a mere conclusion of law and may be disregarded. (*Peninsula etc. Co.* v. *County of Santa Cruz,* 34 Cal.2d 626, 629-630 [213 P.2d 489].) Since the answer and the cross-complaint allege the facts, specifically and with great particularity, on which defendants' claim of ownership of the estate in the oil and gas is predicated, if those allegations show that defendants are not the owners, the demurrers were properly sustained and the motion for judgment on the pleadings was correctly granted.

Summarized, the facts specifically alleged in the answer and in the cross-complaint are that at the time of Luther Lindauer's death he was the owner of the estate in the surface and Union was the owner of the estate in the oil and gas; Lucy Lindauer was the sole devisee named in Luther's will; while acting as executrix of Luther's will Lucy made the agreement with Union; Lucy died; later the administrator of Luther's estate sold the interest his estate had in the realty to plaintiffs; thereafter Union quitclaimed the estate in the oil and gas to the "Owner, its heirs, successors and assigns."

It must be taken as true that Luther was not the owner of the estate in the oil and gas at the time of his death; he was the owner of the estate in the surface. It is settled in this state that an owner of the fee title to land may sever all or a part of the estate in the oil and gas from the estate in the surface. (*Standard Oil Co.* v. *J. P. Mills Organization,* 3 Cal.2d 128, 132 [43 P.2d 797]. See anno: 29 A.L.R. 586; 146 A.L.R. 880.) The estate in the oil and gas,—if of unlimited duration, as in the case at bar,—is a freehold interest, an estate in fee, and real property. (*Dabney-Johnston Oil Corp.* v. *Walden,* 4 Cal.2d 637, 648-650 [52 P.2d 237].) On the death of Luther, testate, title to the estate in the surface vested in Lucy, subject to administration of Luther's estate. (Prob. Code, §§ 28, 107, 120, 300; *Estate of Kalt,* 16 Cal.2d 807, 811 [108 P.2d 401, 133 A.L.R. 1424].) When Lucy made the agreement with Union, she was the owner of the estate in the surface subject to administration, and executrix of Luther's will. As owner of the estate in the surface,

Lucy had the right during administration of Luther's estate to contract with respect to the assets of the estate—the estate in the surface—subject to the control of the probate court to sell such assets for the purpose of administration of the estate. (*United States F. & G. Co.* v. *Mathews,* 207 Cal. 556, 559-560 [279 P. 655] ; *Moffitt* v. *Rosencrans,* 136 Cal. 416, 418-419 [69 P. 87] ; *Estate of Meyer,* 107 Cal.App. 2d 799, 809 [238 P.2d 597] ; *Wood* v. *Long,* 44 Cal.App. 185, 190 [186 P. 415].) The question is, did the rights and benefits of the agreement with Union inure to Lucy, individually, or to the owner of the estate in the surface, whoever the owner might be at the time the rights and benefits accrued?

Manifestly, Union made the agreement with Lucy because she was then the owner of the estate in the surface. Defendants so concede. They also concede that if the agreement between Union and Lucy "definitely shows it was the intent of the parties thereto to vest the oil rights in the record owner of the surface rights, if Union elected to quitclaim, or that said rights to receive the oil rights ran with or are appurtenant to the land, then the judgment should be affirmed, but say that "if the contract clearly shows an intent to quitclaim to Lucy Lindauer or if the contract is so ambiguous that it cannot be ascertained therefrom whether the word 'Owner' as used in the clause respecting quitclaiming means Lucy Lindauer or the record owner of the surface rights, when Union elected to and did quitclaim, then the demurrers should have been overruled and the motion for judgment on the pleadings denied and the ruling of the trial court clearly requires a reversal." They say the word "Owner" in the agreement was intended "as a description of the person of Lucy Lindauer," and that it does not mean "the owner of the surface rights, whoever might be such owner at the time of the quitclaim deed." They argue that if it cannot be said that the word owner, as used in the agreement, definitely means either Lucy or the owner of the surface rights, whoever such person might be, then it is so uncertain that evidence would be admissible to show the meaning intended.

The agreement is not ambiguous or uncertain. It is clear, definite, and certain, and says without equivocation that if Union elects to quitclaim it will do so to the owner of the land. It specifically says it is between Union and the "owners" of the lands described ; and that whenever the term "lands" is used, it shall be taken to mean, unless the context shall otherwise so provide, the lands described or a portion

thereof, and that "lands subject to this agreement" shall be taken to mean land forming part of the lands described "which belong to an Owner or Owners" who have signed the agreement and which have not been quitclaimed by Union. The agreement was manifestly between Union and the owners of the estates in the surface in the lands subject thereto. It was not an agreement with Lucy, individually, separate and apart from her ownership in the estate in the surface. The rights and benefits accruing from the agreement inured to her as owner of the estate in the surface subject to administration of Luther's estate.

Plaintiffs argue that the right to receive the quitclaim deed from Union was appurtenant to and ran with the land. Defendants argue that while the agreement made the right to receive payments thereunder appurtenant to the land, it did not make it right to receive a quitclaim deed appurtenant. We think it did. ▪ The estate in the oil and gas when owned by Union was a profit *à prendre*. (*Dabney-Johnston Oil Corp.* v. *Walden,* 4 Cal.2d 637, 649 [52 P.2d 237] ; 3 Tiffany, Real Property, 427, § 839.) ▪ When Union made the agreement with Lucy, it granted to the owner of the land the right to receive future royalties, an incorporeal hereditament, and an interest in land. (*Callahan* v. *Martin,* 3 Cal.2d 110, 124 [43 P.2d 788, 101 A.L.R. 871].) It also agreed that the owner of the land should receive a quitclaim deed to the estate in the oil and gas, a grant, should Union elect to quitclaim. (*MacFarland* v. *Walker,* 40 Cal.App. 508, 512 [181 P. 248].)

Civil Code, section 1462, reads: "Every covenant contained in a grant of an estate in real property, which is made for the direct benefit of the property, or some part of it then in existence, runs with the land." A transfer in writing is a grant. (Civ. Code, § 1053.) ▪ The agreement was a grant within the meaning of section 1462. (*Cf. Rockefeller* v. *Smith,* 104 Cal.App. 544, 547 [286 P. 487].) The covenant to quitclaim was contained in a grant of an estate in real property. ▪ Under section 1462 the general test determinative of whether a particular covenant runs with the land, is whether it is "made for the direct benefit of the property." ▪ The phrase "made for the direct benefit of the property" means, among other things, "any covenant which affects the title to real property or any interest or estate therein of the covenantee. A covenant made for the direct benefit of the land is one which is intended to restore to the covenantee the owner of the land some right with re-

spect thereto which he has parted with *pro re nata* or for a special purpose. . . . [I]f the covenant is one which concerns the land itself, or in any manner or measure affects its title or any interest therein, then it is, within the meaning of that phrase as it is employed in section 1462, 'made for the direct benefit of the real property' to which it relates.'' (*Sacramento S.F.L. Co.* v. *Whaley,* 50 Cal.App. 125, 130-131 [194 P. 1054], in which a covenant in a mortgage for release of a mortgage lien of any 10-acre lot or more for which $125 an acre had been paid, was held to be a covenant for the unfettering, *pro tanto,* of the title, for the direct benefit of the land—and therefore a covenant running with the land. See anno. 93 A.L.R. 1027.) *Richardson* v. *Callahan,* 213 Cal. 683 [3 P.2d 927], holds that a covenant in an oil and gas lease to keep the premises free from liens arising from operations on the property, is a covenant running with the land. The court gave as examples of such covenants (p. 688) ''to insure, to repair, to deliver up possession, to renew a lease, to exercise an option to purchase, to restrict alienation, to develop mineral resources on a royalty basis, are all such as run with the land.'' *Coburn* v. *Goodall,* 72 Cal. 498 [14 P. 190, 1 Am.St.Rep. 75], holds that a covenant to surrender demised premises, with improvements thereon at the expiration of the term, is a covenant running with the land. ▪ In the case at bar the covenant to quitclaim was not merely personal in nature; it was for the unfettering of the title to the estate in the oil and gas; it created an interest in the owner of the estate in the surface which she did not have before it was made—the return of title to the estate in the oil and gas to the owner of the estate in the surface—it was made for the direct benefit of the property, and was a covenant running with the land. (See *Stanislaus Water Co.* v. *Bachman,* 152 Cal. 716, 727-728 [93 P. 858, 15 L.R.A.N.S. 359]; *Weill* v. *Baldwin,* 64 Cal. 476, 480 [2 P. 249]; *Washburn* v. *A. F. Gilmore Co.,* 116 Cal.App. 370, 373-374 [2 P.2d 506]; *Miller & Lux* v. *San Joaquin Agr. Co.,* 58 Cal.App. 753 [209 P. 592].) ▪ A covenant intended to benefit the land is incident to and runs with it, and whoever becomes the owner of the land is entitled to the benefit of the covenant. (7 Cal.Jur. 728, § 15.)

At the time Union made and recorded the quitclaim deed of the estate in the oil and gas on December 1, 1941, Lucy was dead. Defendants say that ''A deed to dead man is a nullity,'' (*Hunter* v. *Watson,* 12 Cal. 363, 376 [73 Am.Dec. 543]. See, also, *Copeland* v. *Fairview Land etc. Co.,* 165

Cal. 148, 162 [131 P. 119]) ; that the quitclaim deed did not pass title to the estate in the oil and gas, but that equity will enforce it in favor of the heirs of the deceased grantee. The argument is predicated on the erroneous premise that Lucy was the grantee named in the deed. The material parts of the deed read:

"THIS INDENTURE, made this *1st* day of *December*, *1941*, by and between UNION OIL COMPANY OF CALIFORNIA, a corporation, hereinafter referred to as 'Union', First Party, and LUCY LINDAUER hereinafter referred to as 'Owner', whether one or more, Second Party,

"WITNESSETH:

"THAT for and in consideration of the sums of One Dollar ($1.00) and other good and valuable consideration to it in hand paid by Owner, receipt whereof is hereby acknowledged, Union does hereby remise, release and forever quitclaim unto Owner, its heirs, successors and assigns, all of its right, title and interest in and to that certain land situate in the County of Los Angeles, State of California, described as follows, to-wit: [description]."

 A deed is to be construed in favor of vesting title. (Civ. Code, § 1069; *Younger* v. *Moore*, 155 Cal. 767, 773 [103 P. 221] ; 4 Tiffany, Real Property, 58, § 978.) The deed should be construed to give effect to the intention of the grantor—that is, to pass title to the estate in the oil and gas to the then owner of the estate in the surface. This construction is reinforced by consideration of the agreement from which it clearly appears that on Union's election to quitclaim, it would do so to the then owner of the estate in the surface. Union agreed to quitclaim "to the respective Owners (of the lands), as their interests may appear," and "to the respective Owners" of the lands, and to the "Owner or Owners" of the lands. Patently, this meant to the owner of land at the time Union elected to quitclaim and not to the owner at the time the agreement was made. It is not necessary that a grantee in a deed be mentioned by name. If the designation or description is sufficient to identify the person or persons intended, the deed is effectual. The designation of the grantee in the operative clause of the deed as "Owner, its heirs, successors and assigns" was sufficient to pass title to the then owner of the estate in the surface, although Lucy was dead at the time. (*Schade* v. *Stewart*, 205 Cal. 658 [272 P. 567] ; cf. *Sparks* v. *Humble Oil & Re-*

*fining Co.,* (Tex.Civ.App.) 129 S.W.2d 468, 471; *Black* v. *Brown,* 129 Ark. 270 [195 S.W. 673].) The operative or granting clause controls over the caption. (9 Cal.Jur. 254, § 127; *Cecil* v. *Gray,* 170 Cal. 137, 140 [148 P. 935]; *Mac-Farland* v. *Walker,* 40 Cal.App. 508, 512 [181 P. 248]; *Loughridge* v. *Ball,* (Ky.) 118 S.W. 321; *Parks' Ex'rs.* v. *Parks* 286 Ky. 333 [150 S.W.2d 687].) It is apparent that the only reason the name of Lucy was put in the caption as second party was that she was the owner of the land at the time the agreement was made. This is obvious since the caption says, "LUCY LINDAUER hereinafter referred to as 'Owner', *whether one or more,* Second Party." (Emphasis added.)

*Hogan* v. *Page,* 6 U.S. (2 Wall.) 605 [17 L.Ed. 854], is analogous. The court stated that a difficulty had occurred at the land office in respect to the form of patent certificates and patents, arising out of applications to have them issued in the name of an assignee of the original grantee, thereby imposing upon the office the burden of inquiring into the derivative title presented by the applicant. As a result a formula was adopted of issuing the patent to the original grantee "or his legal representatives." The formula was held to embrace representatives of the original grantee in the land by contract, such as assignees or grantees, as well as by operation of law.

In *Ready* v. *Kearsley,* 14 Mich. 215, a deed to "Stewart, or to his legal heirs and representatives" was upheld. The court, in an opinion written by Mr. Justice Cooley, said:

"The deed is to Stewart or his heirs, and it is supposed to fall under the condemnation of that rule of the common law, that a grant made to J. S. or W. S. in the disjunctive, is void for uncertainty: [citing authorities].

"It is evident however, that the reason upon which the case instanced rests, does not apply to this deed. A grant to J. S. or W. S. is void from the manifest impossibility of determining which shall take when the grantor has failed to express his intent. But no such difficulty can arise in the case of a grant to J. S. or to his heirs. If J. S. is living, he has no heirs; and no two parties can claim adversely as grantees under the deed. The manifest intent here was to vest the title in Stewart, if living, and in his heirs or devisees, if he were then dead. Conveyances in this form by public officers or boards have not been uncommon, for the reason that such conveyances are usually made at a period subsequent to that when the right to the conveyance accrued; and it is not always

known when the deed is made, that the party entitled is living.''

There is no doubt but that Union intended a conveyance, and that it had in mind some person or persons to whom title to the estate in the oil and gas should pass. There also can be no doubt that by the phrase ''Owner, its heirs, successors and assigns'' it intended to point out and designate the particular person or persons who should take the estate direct from Union at the time the deed was made. (See *Bremner* v. *Alamitos Land Co.*, 11 Cal.App.2d 150, 153 [53 P.2d 382].) Construing the deed and the agreement together it is clear that such person or persons were the then owner or owners of the land—the estate in the surface. The death of Lucy did not affect the legality of the quitclaim deed. The deed conveyed the estate in the oil and gas to the then record owner of the estate in the surface.

The property to which a devisee acquires title is subject to the control of the superior court for the purposes of administration, sale or other disposition. (Prob. Code, § 300.) A conveyance of real property made by an executor or administrator, pursuant to an order confirming its sale, conveys ''all the right, title, interest and estate of the decedent in the premises at the time of his death; and if prior to the sale, by operation of law or otherwise, the estate has acquired any right, title, or interest in the premises, other than or in addition to that of the decedent at the time of his death, such right, title, or interest also passes by such conveyances.'' (Prob. Code, § 786.) The statute contemplates that for the purpose of sale an estate may acquire a right, title, or interest in property of the estate between the death of a decedent and a sale of the property. The estate in the surface was an asset of the estate in the hands of Lucy as executrix, subject to sale. The rights which Lucy acquired as a result of the agreement with Union were in the nature of profits or proceeds which arose by reason of the ownership of the estate in the surface and were likewise assets of the estate. (See *Estate of De Bernal*, 165 Cal. 223, 235 [131 P. 375, Ann.Cas. 1914D 26].) The consideration which passed to Union by the agreement did not pass from Lucy as an individual. It consisted of rights in the land which were assets of the estate. As we have said, upon the death of a testate, title to his realty passes to his devisees subject to the limitations of administration. One of the statutory limitations on the right of the devisee is the power of the

probate court to sell the realty. (*Estate of Benvenuto*, 183 Cal. 382, 386 [191 P. 678].) The power of the probate court to sell cannot be affected by any agreement the devisee, Lucy, may make, any more than she could free the estate from its liability for the debts of the deceased husband. ▌ The rights which were acquired from Union ran with the land, were for the benefit of the estate, and were assets of the estate. ▌ Lucy could exercise no greater rights with respect to the estate in the surface than she had as devisee; and since the estate which passed to her on Luther's death was subject to administration and sale for the purposes thereof, and was actually sold to plaintiffs for such purposes, any benefits and rights arising out of the agreement with Union inured to the benefit of plaintiffs, the purchasers at the probate sale. Under the plain terms of the statute, the title that passed to plaintiffs on the conveyance to them by the administrator of Luther's estate, conveyed the title of Luther at the time of his death and the rights which the estate acquired by reason of the agreement between Union and Lucy, including the right to receive a deed from Union should it elect to quitclaim.

The fact that at the time plaintiffs purchased from the estate of Luther, April 24, 1941, the title company in its report on the title advised them that the oil rights "constituted an exception and a reservation," is of no consequence. On April 24, 1941, the estate in the oil and gas was vested in Union, and of course, would show as an exception in a report on the title. Union did not make the quitclaim deed of the estate in the oil and gas until December 1, 1941.

Defendants at the oral argument and in a memorandum filed thereafter suggest that plaintiffs' cause of action is barred by laches. ▌ Laches is an affirmative defense, and one who relies on it must plead facts constituting such laches where, as here, there is an opportunity to do so. (*Phoenix Mutual L. Ins. Co.* v. *Birkelund*, 29 Cal.2d 352, 363 [175 P.2d 5].) No facts are pleaded in either the answer or the cross-complaint showing laches. There is no allegation that plaintiffs had any notice or knowledge that defendants claimed any interest in the property prior to the filing of the complaint. (See *McKenna* v. *Ping*, 105 Cal.App.2d 752, 755 [234 P.2d 246].) ▌ Laches is not mere delay, but delay that works a disadvantage to another. A person is guilty of laches only where he has, by his conduct or negligence and delay, induced or suffered another to do or abstain from something, whereby the latter might be injured should he be

allowed to enforce his rights. (*Taber* v. *Bailey*, 22 Cal.App. 617, 623 [135 P. 975].) There is no averment that defendants have been injured or have suffered any prejudice by reason of any delay in bringing of the action. ▮ Lapse of time alone is not sufficient to bar a suit to quiet title.

The appeals from the orders sustaining the demurrers and granting the motion for judgment on the pleadings are dismissed. The judgment is affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

A petition for a rehearing was denied August 10, 1953.